# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: August 20, 2020

```
*  *  *  *  *  *  *  *  *  *  *  *  *
RUTH GEAR,                           *        UNPUBLISHED
                                     *
            Petitioner,              *        No. 18-1684V
                                     *
v.                                   *        Special Master Gowen
                                     *
SECRETARY OF HEALTH                  *        Finding of Fact; Tetanus-Diphtheria-
AND HUMAN SERVICES,                  *        Acellular Pertussis (Tdap); Shoulder
                                     *        Injury Related to Vaccine
            Respondent.              *        Administration (SIRVA); Onset.
*  *  *  *  *  *  *  *  *  *  *  *  *
```

*Jeffrey S. Pop & Kristina Grigorian*, Jeffrey S. Pop & Associates, Beverly Hills, CA, for petitioner.
*Camille C. Collett*, United States Department of Justice, Washington, DC, for respondent.

## FINDINGS OF FACT[1]

On October 31, 2018, Ruth Gear ("petitioner"), filed a petitioner for compensation under the National Vaccine Injury Compensation Program.[2]  Petitioner alleges that as a result of receiving an tetanus-diptheria-acellular pertussis (Tdap) vaccination on November 13, 2015, she suffered a right shoulder injury related to vaccine administration ("SIRVA") with onset of pain within forty-eight (48) hours, constituting an injury listed on the Vaccine Injury Table.  Petition (ECF No. 1).  For the reasons discussed below, I find that the onset of petitioner's shoulder pain began within 48 hours of vaccination.[3]

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims.  The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  **This means the decision will be available to anyone with access to the Internet.**  Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes  medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  "An objecting party must provide the court with a proposed redacted version of the decision." *Id.*  **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

[3] Pursuant to §300aa-13(a)(1), in order to reach my conclusion, I considered the entire record.  This opinion

## I.   Procedural History

After timely filing the petition, on November 30, 2018, petitioner filed her medical records and several supporting affidavits.  Petitioner's Exhibits (Pet. Exs.) 1-20.

On October 7, 2019, respondent filed a status report advising that the record appeared to be complete.  Respondent's (Resp.) Status Report (ECF No. 19).  On November 5, 2019, respondent filed his report pursuant to Rule 4(c).  Resp. Report (ECF No. 21).  Respondent recommended that compensation be denied, for which his only argument was that "the contemporaneous medical records do not support the onset of pain within forty-eight hours of vaccination."  *Id.* at 8.  Petitioner subsequently filed additional affidavits and other materials in support of her claim.  Pet. Exs. 20-22.

On April 22, 2020, I convened a status conference to set further proceedings to resolve the onset issue.  I discussed that the COVID-19 crisis complicated the logisitics of a fact hearing but that option remained available.  Scheduling Order entered April 23, 2020 (ECF No. 28).  Respondent deferred to my decision about which further proceedings should be set.  Resp. Status Report filed April 30, 2020 (ECF No. 29).  Petitioner requested a finding of fact on the record subsequent to the parties' filing of briefs.  Pet. Status Report filed April 30, 2020 (ECF No. 30).  I granted petitioner's request.  Scheduling Order filed May 5, 2020 (ECF No. 31).

On June 18, 2020, petitioner filed a motion for a ruling on the record regarding onset.  Pet. Motion (Mot.) (ECF No. 32).  On July 20, 2020, respondent filed a response.  Resp. Response (ECF No. 33).  On August 6, 2020, petitioner filed a reply.  Pet. Reply (ECF No. 34).  This matter is now ripe for a finding of fact regarding onset.

## II.   Legal Standard

Petitioner bears the burden of establishing the facts necessary for entitlement to an award by a "preponderance of the evidence." § 300aa-12(a)(1)(A).  The special master "may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." § 300aa-13(a)(1).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records, which are required to be filed with the petition.  §11(c)(2).  The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d at 1528.  Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule does not always

---

discusses the elements of the record I found most relevant to the outcome.

apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery*, 42 Fed. Cl. at 391. The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III.   The Factual Record

### A.  Medical Records

#### 1.  Before Vaccination

At the relevant time, petitioner was 54 years old and right hand dominant. She received regular medical care through the Unity Point Health System in Iowa. Her primary care provider was Carin A. Bejarno, ARNP. Petitioner's medical history did not include pain, limited range of motion, or trauma in the right shoulder. It did include other medical concerns including hypertension, hyperlipidemia, morbid obesity, and type II diabetes. *See generally* Pet. Ex. 3.

Petitioner also had a history of depression and family stressors. In December 2013, she presented to the primary care practice, where she "became tearful in the waiting room." Pet. Ex. 14 at 23. Anna Acheson, CMA, took petitioner into a room to privately discuss concerns. Petitioner stated that "overwhelmed with taking care of her daughter, mother, and father, and working NICU" and "she is constantly taking care of others". Petitioner reported that she had been taking Lexapro without dosage changes for a long time. CMA Acheson encouraged

petitioner to talk about these issues in her medical appointments, consider seeing a counselor, and "make time for herself and make sure she is caring mentally as well". Pet. Ex. 14 at 23. After this discussion, petitioner was seen by NP Bejarno for a fasting medication check related to her diabetes. The appointment records do not mention her mental health. Pet. Ex. 14 at 24-27.

As of November 2014, petitioner was taking Lexapro 20 mg. Pet. Ex. 3 at 8. At the next appointment on April 14, 2015, NP Bejarno recorded again that petitioner was dealing with significant stress involved with caring for her numerous family members. Pet. Ex. 3 at 2. NP Bejarno increased the Lexapro prescription to 30 mg daily. *Id.* at 6.

On July 24, 2015, NP Bejarno recorded again that petitioner was dealing with increased depressed mood and fatigue related to her mother passing away in April 2015 and her continued responsibilities caring for her elderly father and daughter, as well as her full time job. Petitioner continued to take Lexapro. She was not doing counseling or any regular exercise. Pet. Ex. 3 at 16. A review of systems was normal including "Musculoskeletal: No cyanosis, clubbing, or edema." *Id.* at 18. NP Bejarno recommended counseling and potentially augmenting Lexapro with other medications. *Id.* at 19.

## 2. After Vaccination

On November 13, 2015, petitioner returned to NP Bejarno for a fasting medication check related to her diabetes. This record does not record depression or personal stressors, but did record fatigue. NP Bejarno set forth a plan for managing petitioner's hypertension, hyperlipidemia, diabetes, and obesity. A review of systems was normal including "Musculoskeletal: No cyanosis, clubbing, or edema." She received a tetanus-diphtheria-acellular pertussis (Tdap) vaccination. The site of vaccine administration is not documented. Pet. Ex. 3 at 24-29; also at Pet. Ex. 2 at 4-8, Pet. Ex. 23.[4]

The next medical record is from January 25, 2016, when petitioner had a bone density exam and a mammogram at Unity Point Health Radiology. She did not see a doctor, only a technician. Pet. Ex. 3 at 57-60.

On March 4, 2016, petitioner returned to the primary care practice for another fasting medication check. However, NP Bejarno recorded that petitioner had been "feeling more down" ever since her mother's death in April 2015, and also because of caring for her other family

---

[4] In the Rule 4(c) report, respondent averred: "The occurrence of vaccination was documented in the records but there is no administration of vaccination record provided. Respondent requests petitioner inquire whether a vaccine administration record is available and, if so, that it be filed into the record." Resp. Report at n. 2. Respondent renewed this request in his brief regarding a ruling on the record. In response, petitioner's counsel requested that the medical provider produce "any and all vaccine administration records, vaccination consent forms, or any other medical records related to the administration of Tdap vaccination on 11/13/2015." Petitioner made this request on December 12, 2019, recalls emailing the records to respondent's counsel on April 22, 2020, and filed the records on August 6, 2020 as Pet. Ex. 23. In her brief petitioner correctly notes that the records pertaining to vaccine administration originally filed as Pet. Ex. 3 at 24-29 are substantially similar to the newly requested records filed as Pet. Ex. 23 at 13, 19, 22-23, 27. It appears that petitioner has complied with respondent's request to seek any record of vaccine administration that would address the site of vaccine administration, but no such record exists.

members and the winter season.  Pet. Ex. 3 at 30.  Petitioner was still taking Lexapro and still wa not doing counseling.  *Id.*  NP Bejarno added "depressive disorder" to the assessment and referred to a counselor.  *Id.* at 32, 34.  This was in addition to discussing the plan to address petitioner's hyperintension, hyperlipidemia, hypertension, diabetes, and obesity.  This record repeats the notation: "Musculoskeletal: No cyanosis, clubbing, or edema."  There is no mention of the right shoulder.  Pet. Ex. 3 at 29-34.

On March 12, 2016, petitioner presented to an urgent care location complaining of a 4-5 day history of cough, congestion, and sore throat, as well as 1 day of fever.  She was diagnosed with bronchitis and prescribed doxycycline.  The review of systems provides: "Extremities: no clubbing, cyanosis, or edema."  There is no mention of the right shoulder.  Pet. Ex. 4 at 4-6.

On June 23, 2016, petitioner returned to NP Bejarno.  The recorded purpose of the appointment was another fasting medication check.  However, NP Bejarno recorded that petitioner's mood was improved in association with continued treatment with Lexapro, seeing a counselor, and exercising regularly.  NP Bejarno also recorded: "She does have concerns with right shoulder pain.  She reports that this is [sic] been a problem since last year.  She reports that when she had her tetanus shot in 2015, she feels like the immunization was given wrong.  Since that time, she has had intermittent pains in the right shoulder.  She reports with certain movements, especially reaching behind her back causes increased pain in the shoulder.  She feels like her range of motion is slightly limited due to tightness.  She denies any known injury to the shoulder."  Pet. Ex. 17 at 1.  NP Bejarno conducted a more detailed musculoskeletal exam.  She recorded that petitioner's abduction and adduction were slightly limited by pain in the anterior aspect of the shoulder; internal and external rotation were limited by pain; and there was ternderness over the anterior aspect of the shoulder joint with palpation.  *Id.* at 4.  A right shoulder was unremarkable, Pet. Ex. 3 at 62-63.  NP Bejarno added "shoulder pain" to the assessment.  Pet. Ex. 17 at 4.  She recommended over-the-counter anti-inflammatory drugs, avoiding heavy lifting, and physical therapy.

At the initial physical therapy appointment on July 11, 2016, the therapist recorded petitioner's account that she "Started having pain in Nov 2015 after getting a vaccine and pain has not gone away, conr to irritate.  TRed [sic? tried?] ice and Aleve but not any relief.  Works in NICU, holding babies hurt[s] as well as most movem[e]nts."  Pet. Ex. 6 at 1.  The mechanism of injury is recorded as "shot".  *Id.*  The onset date is recorded as "11/11/2015".  *Id.*[5]  Petitioner's symptoms were found to be consistent with biceps tendonitis.  *Id.* at 3.  She was prescribed skilled physical therapy twice a week for four weeks, with the goals of improving strength, range of motion, and relief of pain.  *Id.* at 4-6.

On July 19, 2016, on referral from her physical therapist, petitioner presented to an orthopedic practice.  Pet. Ex. 5 at 6.  Brian Haupt, PA, recorded that petitioner had "concerns of right shoulder pain that began about 6 months ago."  *Id.*  "She apparently had a Tdap vaccination at her family physician's office.  The injection was given where she felt was extremely high and

---

[5] Petitioner avers in her onset brief: "Although Petitioner was off by (2) days in her estimate since Petitioner's Tdap vaccination was on 11/13/2015, it is clear that Petitioner was trying to explain that the date she got the vaccination was the date of the onset of her shoulder pain."  Pet. Mot. at 9.

anterior in her shoulder.  She points to the bicipital region of her shoulder.  She had moderate pain for about a 10-day period.  It did improve to some degree but she continued to have intermittent symptoms.  It has continued to bother her throughout this time and now it is to the point where it wakes her up at night.  She will have some occasional numbness in the C6-7 distribution in the right upper extremity.  She denies having any history of an abscess or other masses that she can recall." *Id.*  PA Haupts' assessment was long head bicipital tendonitis. *Id.* at 7.  "Given the history of having an injection in this area and the chronicity", he ordered an MRI of the right shoulder before initating formal treatment. *Id.*

On July 20, 2016, petitioner returned to NP Bejarno to follow up on her right shoulder pain and complete FMLA paperwork for her job as a nurse.  NP Bejarno recorded: "She reports that her shoulder pain has been a problem for the past 9 months.  She reports that when she had her tetanus shot in Nov 2015, she feels like the immunization was given wrong.  Since that time she has had intermittent pains in the right shoulder… She denies any known injury to the shoulder." Pet. Ex. 3 at 34.  *Id.*  On physical examination, there was tenderness with palpation to the anterior aspect of the shoulder; strength at 4/5; and limited range of motion.  NP Bejarno was unable to fully assess the rotator cuff stability "due to the weakness with limited range of motion." *Id.*  NP Bejarno prescribed diclofenac (Voltaren) and asked petitioner to forward the report from the MRI once it occurred.  Pet. Ex. 3 at 34-37; *see also* Pet. Ex. 22 at 1-4 (FMLA paperwork signed by NP Bejarno).

On July 26, 2016, the MRI of the right shoulder revealed supraspinatus and infraspinatus tendinopathy, posterior labrum tearing, and mild subacromial subdeltoid bursitis.  Pet. Ex. 5 at 4. On August 3, 2016, petitioner returned to the orthopedic practice, where she received a cortisone injection.  Pet. Ex. 5 at 1.  It was noted that "if the injection is unsuccessful then referral to a surgeon would be the next step." *Id.* at 3.

On August 5, 2016, NP Bejarno recorded that the cortisone injection was associated with improvement.  NP Bejarno also reviewed the MRI findings of tendinopathy, a small posterior labrum tear, and bursitis.  She did not reference petitioner's earlier accounts that the Tdap vaccination was given wrong and caused the right shoulder symptoms.  Pet. Ex. 3 at 38-40.

On August 8, 2016, the physical therapist recorded that petitioner's pain was better following the cortisone injection, but increased with certain movements.  Pet. Ex. 6 at 7-8.  She continued physical therapy until October 25, 2016.  Pet. Ex. 6 at 8-13; Pet. Ex. 7 at 1-11.  On October 31, 2016, NP Bejarno recorded petitioner's continued right shoulder complaints and filled out additional FMLA paperwork.  Pet. Ex. 8 at 9-10; *see also* Pet. Ex. 22 at 5-8.

On November 8, 2016, petitioner presented to the orthopedic practice again, where she was seen by Nicholas J. Honkamp, M.D. [6]  He recorded that petitioner "was initially seen in the

---

[6] Respondent notes Dr. Honkamp's notation that petitioner "actually took care of our twins in the NICU." Pet. Ex. 9 at 1.  This does not seem relevant.  Petitioner did not seek out Dr. Honkamp based on a personal relationship. Instead, the physical therapist referred petitioner to the orthopedics practice, where she was first seen by several physician assistants.  When her symptoms continued and a cortisone injection was not associated with significant improvement, her case was elevated to an orthopedist to consider surgery.

Urgent Injury Clinic on July 19 on referral from the physical therapist… [Petitioner] thinks she had some pain that began with a Tdap vaccination at her family's office about six months prior to that.[7]  She began having worsening pain over her lateral arm with impingement type symptoms." Pet. Ex. 9 at 1.  Dr. Honkamp also recorded that a subacromial steroid injection carried out in August gave her "about 85% pain relief for about 4-5 weeks per her report and then her pain came back." *Id.*  Dr. Honkamp's assessment was right shoulder impingement. *Id.* at 2.  He recommended subacromial decompression, to which petitioner agreed. *Id.* at 3.

On November 28, 2016, petitioner underwent surgery by Dr. Honkamp, who performed right shoulder arthroscopic subacromial debridement and decompression with minimal debridement of rotator cuff, bursal side.  Pet. Ex. 11 at 43-44.  The post-operative diagnosis was: "[r]ight shoulder subacromial impingement with mild bursal-sided rotator cuff tearing." *Id.*

Petitioner attended regular post-surgical physical therapy sessions.  On December 20, 2016, Dr. Honkamp recorded that she was having more stiffness, soreness, and decreased range of motion following a physical therapy session.  Dr. Honkamp discussed that the physical therapy may be "stir[ring] up" some inflammation.  He administered a steroid injection to the right shoulder and had petitioner resume physical therapy the following week.  Pet. Ex. 13 at 4-6.

On December 30, 2016, Dr. Honkamp authorized petitioner to return to work for 4 hours per day until January 11, 2017, then to return without resrtiction.  Pet. Ex. 13 at 3-4.  On January 17, 2017, she was discharged from physical therapy with a home exercise program.  Pet. Ex. 15 at 8-16.  On January 24, 2017, Dr. Honkamp recorded that petitioner had resumed working 12-hour shifts, which was associated with soreness, for which she applied ice.  Petitioner also reported that "when she is doing any repetitive exercises, she notices every once in a while some clincking and popping." Pet. Ex. 13 at 1.  Dr. Honkamp recommended a home exercise program to build up her muscles. *Id.* at 2.

On March 7, 2017, petitioner followed up with Dr. Honkamp, who recorded that her condition was improved and that she was sleeping better.  However, Dr. Honkamp recorded that she had a lot of inflammation prior to surgery and that can lead to a slower recovery over all.  Dr. Honkamp emphasized that she needed to adhere to her home exercise program to maximize her strength and overall results.  Pet. Ex. 16 at 1-2.

## B. Affidavits

### 1. Petitioner

In her affidavit filed November 30, 2018, petitioner Ruth Gear states that she has been employed by Unity Point Health System in Iowa for 36 years as a registered nurse (RN).  Pet. Ex. 1 at ¶ 3.  She has been working at Unity Point Health System – Blank Children's Hospital in the Neonatal Intensive Care Unit  (NICU) for over 31 years. *Id.*

---

[7] The primary care appointment and Tdap vaccination were actually on November 13, 2015, over *eight* months before petitioner presented to the orthopedic practice on July 19, 2016.  Regardless, Dr. Honkamp accurately summarizes petitioner's key contention: that the Tdap vaccination marked the start of her right shoulder symptoms.

Petitioner recalls that prior to the Tdap vaccination on November 13, 2015, she did not have any history of pain, limited range of motion, or trauma to her right shoulder. *Id.* at ¶¶ 5-7, 9. Her mother passed away in June 2015. *Id.* at ¶ 8. At that point, she became a sole caretaker for her father who lived across the street from her. *Id.* Petitioner recalls that she would "buy groceries, cook meals for him, and make sure he takes his medications" until he passed away in the summer of 2015. *Id.* During this same time period, she was also caring for her husband and her adult daughter living at home, who each had their own health issues. *Id.*

Petitioner recalls that on November 13, 2015, she went to Unity Health Clinic family medicine for a diabetic exam follow up. *Id.* at ¶ 10. She was seen by NP Bejarno and she received a Tdap vaccine administered into her right shoulder. *Id.* Petitioner recalls: " I developed right shoulder pain immediately following my Tdap vaccination. I had constant moderate pain for approximately 10 days after the vaccination." *Id.* at ¶ 11. Petitioner recalls that she called the medical practice and that someone returned her call and advised "to give it some time and the pain should diminish." *Id.* "Thereafter, my pain became intermittent and I was hopeful that with time my pain would go away." *Id.* However, over the ensuing months, petitioner had continued "intermittent" right shoulder pain for which she used ice packs, essential oils, and over-the-counter pain medications which provided temporary relief." *Id.* at ¶ 13.

Petitioner recalls that on March 4, 2016, when she presented for a diabetic exam follow up with NP Bejarno, she reported her increased stress due to various factors. Petitioner recalls also reporting: "I have been experiencing intermittent right shoulder pain since I received my Tdap shot in November 2015. [NP Bejarno] advised me to take over the counter pain medication and give it time." *Id.* at ¶ 14.

Petitioner recalls that on March 12, 2016, she presented to the urgent care facility "due to cough, congestion, sore throat for 4-5 days and fever", where she was diagnosed with acute bronchitis. *Id.* at ¶ 15.

Petitioner recalls that she continued to have shoulder pain which was intermittent, but increased over time and started to interfere with work and activities of daily living. She had trouble reaching behind her back and across. At times, her right shoulder pain would wake her up at night. *Id.* at ¶ 16. She also recounted seeking additional medical attention as set forth in the records above. *See id.* at ¶ 17-41.

## 2. Richard Gear

Petitioner's husband is a contractor. Pet. Ex. 20 at ¶ 4. He suffers from chronic pain in association with several injuries sustained in the course of his employment. *Id.*

The husband recalls that petitioner "received a Tdap vaccination in the fall of 2015." *Id.* at ¶ 5. She did not have any pain or limited range of motion in the right shoulder beforehand. *Id.* at ¶ 6. "Within 24 hours of receiving the Tdap vaccination, my wife Ruth Gear complained to me that she had right shoulder pain from the Tdap vaccination. She said that her shoulder was swollen. Ruth applied ice packs to her right shoulder. She also took over-the-counter medication for her right shoulder pain." *Id.* at ¶ 7.

The husband recalls that "[s]hortly after the Tdap vaccination that injured [petitioner's right shoulder]", he started doing more chores around the house such as changing the cat litter and carrying grocery bags. *Id.* at ¶ 8. He also recalls that petitioner developed stiffness and limited range of motion, after which he need to help reaching items from higher shelves. *Id.* He went on to detail the extent of petitioner's suffering as a result of the Tdap vaccination. *Id.* at ¶ 9.

### 3. Lexi Gear

The daughter avers that she was born in 1992 and lives with her parents. Pet. Ex. 21 at ¶ 4. She recalls that petitioner did not have any pain or limited range of motion in her right shoulder prior to receiving a Tdap vaccine in November 2015. *Id.* at ¶ 7. The daughter then recalls petitioner stating that "her right shoulder was hurting a lot" later that same day. *Id.* at ¶ 5. The daughter recalls that it became painful for petitioner to move her right arm and that petitioner applied ice packs to the right shoulder hoping that it would help. *Id.* at ¶ 6. The daughter recalls that "[w]ithin a few days of the Tdap vaccination", petitioner called the clinic where she received the vaccination and complained about her pain, and the clinic said to give it time. *Id.* at ¶ 8. The daughter recalls petitioner stating that she was having difficulty at her job as a nurse due to her shoulder pain and that she also had difficulty completing household tasks. *Id.* at ¶ 9-10. The daughter recalls petitioner taking over the counter medications, using heat pads, and avoiding use of her right arm before seeking medical treatment. *Id.* at ¶ 11-12.

### 4. Marjorie Grote

The sister recalls that on Thanksgiving Day, which was on November 26, 2015[8], she spoke to petitioner on the phone. Pet. Ex. 19 at ¶ 6. The sister recalls petitioner stating that her shoulder had been hurting since she got a flu shot[9] about two weeks prior. *Id.* The sister recalls also speaking on the phone with petitioner the day after Thanksgiving, the timing of which the sister remembered that her mother-in-law passed away that same day. *Id.*

The sister recalls that in December 2015, during the Christmas holidays, she visited petitioner at her home. *Id.* at ¶ 8. During this visit, petitioner complained about pain and difficulty reaching, lifting, and carrying things with her right arm, which was her dominant arm. *Id.* After Christmas, during their phone conversations, petitioner continued to complain about her ongoing shoulder pain and the sister urged her to see a doctor. *Id.* at ¶ 9.

The sister avers: "My sister Ruth is a very caring and giving person. She puts everyone else before her." *Id.* at ¶ 10. The sister recalls petitioner's responsibilities caring for her multiple family members during the relevant time. *Id.* at ¶ 11. The sister avers that these family obligations contributed to petitioner's delay in seeking treatment for her right shoulder. *Id.* at ¶¶

---

[8] *See* Calendar for Year 2015 (United States), available at
https://www.timeanddate.com/calendar/?year=2015&country=1.

[9] This may represent either an incorrect memory of what vaccine petitioner received or an inadvertent error in the affidavit. Petitioner in fact received a Tdap vaccination on November 13, 2015. Pet. Ex. 1 at 1.

11, 12.  Additionally, petitioner "was hopeful that her pain would diminish over time"; she did not seek treatment until the pain actually persisted and got worse.  *Id.* at ¶ 13.

### 5.  Jane Washington

Ms. Washington states that she has been employed by Unity Point Health System, at Blank Children's Hospital, in the NICU as a RN since 1981.  Pet. Ex. 18 at ¶ 3.  She recalls meeting petitioner "many years ago at work" in the NICU, where they both remain employed. *Id.* at ¶ 4.  Ms. Washington saw petitioner approximately three days per week during 2015 – 2016.  Ms. Washington recalled that "sometime in the fall of 2015", petitioner complained about getting a vaccination in her shoulder and afterwards developing pain, loss of range of motion, and weakness.  *Id.* at ¶ 6.  Petitioner had difficulty raising her arm above her head and asked for help reaching top shelves.  *Id.* at ¶ 9.

## IV.   Party Contentions

In her motion for a ruling that onset of her shoulder injury occurred immediately and therefore within 48 hours of the Tdap vaccination on November 13, 2015, petitioner acknowledges that there are no medical records of the injury until June 23, 2016.  Pet. Mot. at 21.  She avers that she prioritized taking care of her elderly father, adult daughter, and husband – in addition to her work obligations – during this period.  Pet. Mot. at 13.  Petitioner argues that on March 4, 2016, she reported the right shoulder injury to NP Bejarno, who "omitted [their] discussion" either intentionally (because petitioner was alleging that the vaccine was administered improperly by NP Bejarno) or unintentionally (because the purpose of the visit was management of petitioner's diabetes and petitioner's mental health was an additional topic of discussion).  Pet. Mot. at 12-13; Pet. Reply at 4-7.  Petitioner argues that the March 12, 2016 urgent care record did not address her shoulder because the visit was "specifically to address her urgent needs such as fever and symptoms of bronchitis.  Pet. Mot. at 13; *see also* Pet. Reply at 7.  Petitioner argues that there is support from the medical records beginning on June 23, 2016.  Pet. Mot. at 8-11.  Petitioner argues that her own affidavit and four other witnesses' affidavits are credible and consistent with the medical records which do address the right shoulder injury.  Pet. Mot. at 11-17, citing Pet. Exs. 1, 18-21.

In response, respondent argues that a special master may not make a finding based upon the claims of petitioner alone.  Resp. Response at 12, citing § 300aa-13(a)(1).  "Ultimately, the petitioner must substantiate the occurrence of a compensable, vaccine-related injury with independent evidence."  Resp. Response at 12, quoting *Lett v. Sec'y of Health & Human Servs.*, 39 Fed. Cl. 259, 260 (1997) (denying review of the special master's determination that the petitioners did not present independent evidence supporting that their daughter experienced seizures).  Respondent correctly notes that medical records are presumed to be accurate and complete, then argues that at the March 4, 2016 appointment with NP Bejarno, "petitioner's musculoskeletal exam was unremarkable".  *Id.* at 14, citing Pet. Ex. 3 at 29-34.  Therefore, respondent argues that "the medical records establish that petitioner's right shoulder pain did not begin within days of vaccination (and instead likely began closer to seven months after vaccination)".  *Id.*  Petitioner replies that the March 4, 2016 appointment record *does not* state that her musculoskeletal exam was "unremarkable", instead, it states: "no cyanosis, clubbing, or

edema".  Pet. Reply at 6-7 (defining each term). Petitioner avers that the musculoskeletal notation shows only that petitioner "did not have skin discoloration, bulbous enlargement of her toes/fingers, and/or swelling."  *Id.* at 7.  Thus, the March 4, 2016 record does not provide conflicting evidence, but rather it is *silent* about right shoulder pain.  *Id.*

Respondent also argues: "There is no evidence to conclude (especially based on the alleged severity of the symptoms) that petitioner would wait nearly seven months to seek treatment and fail to mention those symptoms, particularly when as a health care worker, petitioner presumably had ready access to health care providers."  *Id.* at 15. Respondent adds: "Presumably if petitioner's shoulder pain was described, it would have come to the attention of more than one of her coworkers as her work required her to routinely pick up infants."  *Id.* Petitioner did not reply to these arguments.

Finally, respondent asserts: "If one accepts that [petitioner] did experience immediate pain, which was then followed by ten days of moderate pain, petitioner's own affidavit asserts that the shoulder pain became 'intermittent' which is not sufficient on petitioner's *ipse dixit* to establish that the intermittent pain had the same point of origination as the moderate but continuous pain that persisted for ten days post-vaccination."  *Id.* at 12.  Petitioner replies that her shoulder pain began immediately after the vaccination, was moderate for about 10 days, then improved somewhat but remained "intermittent."  Pet. Reply at 3-4, citing Pet. Ex. 5 at 6.

## V.    Discussion and Conclusion

Following a review of the entire record and the parties' briefs, I find that there is preponderant evidence that petitioner's right shoulder pain began within 48 hours of the Tdap vaccination on November 13, 2015.  I disagree with respondent that petitioner's pain instead began seven months after the vaccination.

Respondent cites *Lett* for the proposition that: "Ultimately, the petitioner must substantiate the occurrence of a compensable, vaccine-related injury with independent evidence." Resp. Response at 12, quoting *Lett*, 39 Fed. Cl. 259, 260.  A comparison to *Lett* actually demonstrates the relative strength of the evidence for petitioner's allegations here.

First, in *Lett*, none of the medical records supported the petitioners' allegations that their child had experienced seizures.  39 Fed. Cl. 259, 262.  Medical records from an alleged emergency room visit and the hospital's doctor on duty were never found.  *Id.*  In contrast, the current claim includes medical records, dated beginning June 23, 2016, supporting that petitioner's shoulder pain began after the Tdap vaccination.  *See* Pet. Ex. 17 at 1 ("right shoulder pain… since last year… when she had her tetanus shot in 2015, she feels like the immunization was given wrong"); Pet. Ex. 6 at 1 ("started having pain in Nov 2015 after getting a vaccine and pain has not gone away"); Pet. Ex. 5 at 6 ("She apparently had a Tdap vaccination at her family physician's office… She had moderate pain for about a 10-day period… It did improve to some degree but she continued to have intermittent symptoms"); Pet. Ex. 3 at 35-37 ("her shoulder pain has been a problem for the past 9 months.  She reports that when she had her tetanus shot in Nov 2015, she feels like the immunization was given wrong.  Since that time she has had

intermittent pains in the right shoulder"); Pet. Ex. 9 at 1-3 ("she thinks that she had some pain that began with a T-dap vaccination at her family's office").

Respondent correctly notes that there is a gap in petitioner's medical records after the November 13, 2015 appointment where she received the Tdap vaccination. However, I do not share respondent's presumption that based on petitioner's employment as a NICU nurse at a children's hospital, she would have "ready access to health care providers" to treat her shoulder injury. Resp. Response at 15. The medical records actually demonstrate that petitioner relied on scheduled appointments with her primary care provider NP Bejarno. In one instance, petitioner had a 4-5 day history of cough, congestion, and sore throat, as well as one day of fever. One might presume that if petitioner had "ready access to health care providers" through her employment, she would have taken advantage of those contacts. But instead, she went to an urgent care facility. Pet. Ex. 4 at 4-6. The medical records also establish that petitioner had significant obligations not only with work but also in caring for several close family members with medical issues, whose needs she tended to put in front of her own. *See, e.g.*, Pet. Ex. 14 at 23; Pet. Ex. 3 at 2-6, 16-19, 29-34.

With regard to the post-vaccination medical records *not* mentioning shoulder pain, I find reasonable petitioner's explanation that the January 25, 2016 encounter was only for a bone density exam and a mammogram, for which she did not see a doctor, only a technician. *See* Pet. Ex. 3 at 57-60; Pet. Ex. 1 at ¶ 12. I also find reasonable petitioner's explanation that the March 12, 2016 record does not mention her right shoulder because this was an urgent care visit focused on assessment and treatment of acute bronchitis. *See* Pet. Ex. 4 at 4-6; Pet. Mot. at 3; Pet. Reply at 7. That leaves the March 4, 2016 appointment with NP Bejarno. Pet. Ex. 3 at 29-34. Respondent argues that this record is accurate, complete, and reflects that petitioner's musculoskeletal exam was "unremarkable." Resp. Response at 12. However, the record does not state "unremarkable". It states only: "Musculoskeletal: no cyanosis, clubbing, or edema", which, as petitioner persuasively argues, does not expressly address the presence or absence of shoulder pain. Pet. Reply at 6-7. This field appears to be pre-filled or duplicated, because the records from at least the previous two appointments with NP Bejarno have the same exact notation. *See* Pet. Ex. 3 at 27 (November 13, 2015), *id.* at 18 (July 24, 2015). Additionally, the March 4, 2016, appointment was for a fasting medication check. *See id.* at 24. While medical records are presumed to be accurate and complete, there is no indication that this appointment included an assessment of the shoulder. Here, the medical records all merit consideration, and some support petitioner's allegations. They certainly present a closer question than the utter absence of corroborating records in *Lett*.

In *Lett*, the Court of Federal Claims recognized that a petitioner may corroborate her claim not only via "medical records, or by a credible expert medical opinion" but also via "testimony of one or more other witnesses". 39 Fed. Cl. 259, 261. In *Lett*, the petitioners did not have any other witnesses with independent recollection of the events in question. In contrast, in the current claim, petitioner has submitted four other witnesseses' independent recollections of her shoulder injury. Pet. Exs. 18-21. Respondent argues that these individuals – petitioner's husband, daughter, sister, and long-time coworker – are "interested parties" whose accounts should not be credited. Resp. Response at 15. However, it is not obvious that these individuals will benefit from a favorable ruling in petitioner's claim and there is no evidence that they are

acting in bad faith. Family members, friends and work associates are also the people most likely to have heard petitioner's complaints of pain and to have observed her limitations with activities of daily living such as difficulty reaching overhead or  applying ice packs to the shoulder   These individuals have provided detailed recollections of petitioner suffering the onset of right shoulder pain beginning within 48 hours of her vaccination.  *See, e.g.*, Pet. Ex. 19 at ¶ 6 (the sister's recollection that on Thanksgiving Day, November 26, 2015, petitioner complained of shoulder pain beginning about two weeks prior); Pet. Ex. 18 at ¶ 6 (the coworker's recollection that petitioner developed left shoulder pain following a vaccination in fall 2015).  The sister also confirms that petitioner was dealing with significant personal stressors including her mother's death in April 2015, resulting in petitioner becoming the primary caretaker for her father who passed away in summer 2016.  *See* Pet. Ex. 1 at ¶ 8; Pet. Ex. 19 at ¶¶ 10-12.  Together with the commonly given advice to "give it time" and her hope that her shoulder pain would go away,   I find this to be a compelling explanation for petitioner's delay in seeking treatment for her right shoulder and also perhaps failing to mention the right shoulder pain in the March 4, 2016 appointment with NP Bejarno.

Respondent also seems to fault petitioner for submitting the affidavit of only one coworker.  Resp. Response at 15.  There is no evidence in the record that petitioner was unable to locate other such coworkers with recollections of her shoulder injury and respondent did not make that request before briefing this issue.  I do not see reason to fault petitioner or her counsel for submitting the affidavit of only one coworker.

Finally, respondent argues that even if petitioner establishes that she had "moderate but continuous pain that persisted for ten days post-vaccination", there is insufficient evidence connecting that to her later "intermittent pain", which might have had a different "point of origination".  Resp. Response at 12.  I agree with petitioner that there is no clear distinction between the immediate shoulder pain alleged by petitioner and her supporting witnesses, and the shoulder pain recorded in the later contemporaneous medical records.  *See* Pet. Reply at 6.

## VI.    Conclusion

In accordance with the above and a review of the record as a whole, I hereby find that the onset of petitioner's right shoulder pain was within 48 hours after the administration of the November 13, 2015 Tdap vaccine.

The following is **ORDERED:**

1) The parties shall file a joint status report proposing further proceedings **within 30 days, by Monday, September 21, 2020**.

**IT IS SO ORDERED.**

> **s/ Thomas L. Gowen**
> Thomas L. Gowen
> Special Master

13